The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. The first case this morning is 20-1640, Sunoco Partners Marketing v. U.S. Venture, Inc. Mr. Jay, whenever you're ready. Good morning, Your Honor. Thank you. William Jay for U.S. Venture. We've raised a number of issues in our affirmative appeal, and I'm going to begin with the on-sale bar, touch briefly on the claim construction issues, and finish with the enhanced damages issue. Mr. Jay, I'm sorry. I don't want to throw you off your stride, and you shouldn't worry about the time here, but it would be helpful to me to get a number of housekeeping questions on the way, out of the way, and that deals with all of these moving parts and how they affect each other. So let me start on the on-sale bar versus the infringement. Am I correct that if you were to hypothetically prevail on the on-sale bar, that would leave which claims open to consideration for infringement? I believe that would leave the claim 17 of the 302 patent and claim 31 of the 629 patent. It would potentially also leave open the 948 and 548 claims. That's what I was going to ask you. So the on-sale bar does not affect the claims that issue in dispute at the IPR proceeding? I believe that that's right. I believe that that's right, not for all of them. Okay. Now let me ask you also just on the reasonable royalty question. If, for example, is this all one bucket, so that if you lose on any infringement claim on either of the two patents, the non-IPR patents, the royalty stays? Or does the royalty have to be recalculated? If you reject the other side's challenge to the damages measurement and affirm the district court's royalty calculation, then Venture would have to prevail on each of the issues going to infringement or invalidity in order to change the damages judgment. We would not ask the court to recalculate the royalty if we prevailed on some but not all of those issues. We would, however, if the cross-appeal came out the other way, it would be very important to figure out which claims remain. And then, likewise, it might conceivably affect the court's handling of enhanced damages to understand which claims remain. Because, for example, there would be no basis for enhancement if the only claims remaining were 948 and 548 claims. Okay, well, thank you. That's been very helpful. Now please proceed. Counsel, this is Judge Randall. Just to be clear, tell us which claims are affected by the on-sell bar. I'm afraid I'm going to get this wrong, but the system claims of the 302 patent and, I believe, the first of the method claims, claim 16. That's 2, 3, and 16 of 302 and 2 of 629? That's correct. But it would not include claim 31 of 629. Okay, thank you. Thank you very much, Your Honor. So to start with the on-sale bar, under this court's objective test, Sunoco's predecessor placed the patented invention on sale when it agreed to sell the invention in consideration for a profitable long-term butane supply contract. And the district court held to the contrary only by misinterpreting the contract in at least four ways. And I'll just run through them quickly. The court thought the equipment was provided for free. It was expressly in exchange for valuable consideration. The court thought the deal was contingent on the outcome of the acceptance testing at Equilon. It wasn't. The court thought the contract required secrecy. It didn't. The court thought the testing at Equilon was experimental. It was, in fact, ordinary acceptance testing as set out in Schedule 1.10 of the agreement. Really, the purpose of the sale to Equilon wasn't to experiment with any of the technology. It was to commercialize the invention. It is the nature of the sale that matters. Under Allen, it doesn't matter whether the invention was a prototype, was under development, or was subject to testing. The purpose was commercial. As the inventors themselves admitted, they wanted to raise money in order to make the testing that they did at Wheatland worthwhile. That is sufficient to reverse the district court on the on-sale bar. Mr. J., if we, Sunoco tells us at page 36 in its red brief, that even if you prevail on these issues, we can't decide the ready for patenting prong on the on-sale bar because there are factual disputes that would have to be resolved by the district court. In other words, it would require a remand for ready for patenting. Do you agree with that? Well, we, in our opening brief, explained why we think the claims that the invention was ready for patenting. The other side didn't join issue with that, with any specifics, but just said it should be sent back. The district court certainly did not reach it, and I recognize that it would often under those circumstances be appropriate to remand a question like this. But I guess I would just note that Sunoco didn't dispute any of the points that we made in our opening brief. Well, my recollection, I haven't memorized the brief, obviously, but my recollection is that indeed on page 35 of red, they do argue that the invention was missing essential software as of the critical date. So they do raise that as a potential factual question that would have to be resolved below, right? They do. They don't cite anything in the record for that. They just cite the robotic case. And the question would be whether the supposedly critical software, in fact, is part of the claimed invention. But we're not here to fight that point. The point I think I'd like the court to take from this is that if it were to remand, it should remand only on ready for patenting. It should resolve the commercial sale point. Counsel, this is Judge Ray. Now, you argue that the district court erred in determining that butane supplies were auxiliary goods. But butane is not part of the invention. Is that correct? Butane is certainly not part of the invention. So for purposes of the on sale bar, as opposed to the damages case, what matters is that the invention was sold in exchange for valuable consideration. And the very substantial butane supply agreement certainly was valuable consideration because Equilon agreed to buy. Isn't there some confusion then as to exactly what was sold? No, I don't think so because the invention was sold and what MCE, which is Sunoco's predecessor, got in exchange. That means that the butane supplies were just auxiliary. No, I don't think so. I think that the butane supply arrangement was the consideration for the sale. And you don't have to take my word for it. That's expressly recited in Section 1.01 of the agreement. It says that in consideration for the butane supply agreement, that MCE is providing the invention, the equipment. So the question whether it's auxiliary is something that I'm sure we'll come back to in discussing the cross appeal. But what matters for the purposes of whether it's a commercial sale is whether the purpose of selling the invention was to raise money, as we've argued, or whether it was to engage in experimentation of the sort that can only be engaged in through a sale to a buyer. And the nature of the testing that occurred at Equilon's site just isn't that kind of testing. Well, you can keep going, Mr. J., because I have a few more questions, too. Thank you, Your Honor. I appreciate that, and I'll try not to abuse the license that you're giving me. But I think that really is the key point, that the valuable consideration is the agreement to buy butane. And you see that not just in the provision that I mentioned a moment ago, but also in the fact that, I believe this is in 3.03, that if the butane blending arrangement has to end because the law changes or something happens like that before Equilon has bought all the barrels of butane, then it has to pay what it calls a prorated share of the purchase price for the equipment, which I think makes very clear that these are all wrapped up together, that the reason the equipment is being provided is in consideration for the profitable butane supply arrangement. Mr. J., this is Judge Stoll. I want to ask you a couple of questions about the enhancement in willfulness. One of them is, where, in her opinion, did the district court judge find willful infringement? I've looked through, and I see no express finding of willful infringement. I think that that's fair, Your Honor. Certainly, enhancement is permitted without an express finding of willfulness, but you'll see that the district court heads her opinion, willfulness and enhanced damages, which is at page 164. And the way that Judge Pallmeyer went through it was to say that the facts were evidence of copying, that the opinion of counsel did not qualify. The expansion of the butane blending business was an aggravating factor and then relied on litigation conduct. And I agree that the court doesn't expressly find that any of those things amounts to willful infringement. Now, you say that you don't have to have willful infringement as a predicate to an enhancement award. What case do you think or cases support that? Well, as we read HALO, I'm certainly not trying to argue for and to ask this court to expand the concept of district court's authority to award enhanced damages. We read HALO to say that district courts have discretion in this regard. Discretion is not whim. There are established standards for awarding enhanced damages, and the standard this court adopted is very close to the willfulness standard this court had previously applied. So, I'm certainly not urging the court to change its standard, but we are saying that whether the other side were to argue that enhancement is appropriate without regard to willfulness or enhancement is appropriately based on willfulness, there's no basis for enhancement here and certainly not a top-of-the-range enhancement based on this kind of conduct. And there really are just two basic reasons for that. One is the opinion of counsel, which we think... I'm familiar with that argument of yours based on the Mannion opinion, but can you tell me what is the appendix page of the figure mentioned in the Mannion opinion? I couldn't figure it out from the record in front of me. The appendix... You know how the Mannion opinion relies on a particular figure that was provided to Mr. Mannion? I just don't know what that figure is. I'm not sure that... I don't have that page number ready to hand. I will try and have it for you when I stand up for rebuttal. Thank you. Because the opinion refers to the figure and there's some testimony about the figure, but nowhere does anyone tell us which page in the appendix is that, you know, corresponds to the figure. Thank you. I'd appreciate that. Can I follow up? This is Judge Prost. Just following up on another sort of gap in the record, perhaps, and this is also on the enhancement issue. At page 168 of the appendix, in the district court's opinion, she says, Sunoco argues with some force that this evidence shows that Venture withheld critical information from Mannion when he drafted the letter. And the next sentence is followed by some transcript sites, which I don't think we have in our appendix. And do you know what I'm referring to, Mr. J? It's on the second paragraph on page 168. I do have it in front of me, yes. Okay. Now, you do make the argument at 57 of blue that the only concrete failure that she identified, and you do give us some appendix sites about that. Could you just give us a little more information and tell us if, indeed, those trial transcript sites are available anywhere in the appendix? So neither 1149 nor 1308 is in the appendix, which are the pages that are cited where your owner is looking. And I guess also 1031 is also not in the appendix. We certainly can file copies of it, and they are on the – I apologize. 1031, which is appendix 7323, is available, but the other two are not. They are available on the district court docket, and we certainly could file copies of them if the court would like to look at them. But on this point that the district court was raising about the insufficiency of the information that Mr. Mannion was provided, you do respond to that, as I said, in Blueprint 57. And, well, I'll ask Red this, because I don't recall that they responded in kind to anything about this point. So where are we left in the record? Your view is that they did not withhold critical information, and this was just a clear error by the district court? I think that that's right. And the district court – the district court at one point inferred that something must have been withheld because she was troubled by the fact that the testimony was that some things were provided orally. But, you know, certainly if that's true, then nothing was withheld, and there's no basis for believing it not to be true. Just to – on this same point, is it your argument that the court does not have to make an explicit finding of willful infringement or willfulness? I want to make sure I understand the question. That in order to enhance damages, the court doesn't have to make an express finding of willfulness? Our argument does not depend on the district court – on whether or not the district court made a finding of willfulness. I do think that the best reading of the district court's opinion is that she thought the infringement – the district judge thought the infringement was willful, and that that was incorrect for the reasons that we've given. And so I just don't think that this case presents the question of how broad a district court's authority to enhance could be on some other grounds, except for the litigation conduct point. And we've responded to that in our brief by saying that enhanced damages are to punish culpable infringement, not litigation conduct. Well, is it a factor when we consider revaluation that the district court damages finding should be vacated and remanded? The lack of an explicit finding? I think – I think that if that were all the court said, I think the district court – if that were all that this court said, I do think that the district court made its view pretty clear. But if this court were to hold that an express finding of willfulness is required and were to vacate the enhanced damages award on that basis, we certainly wouldn't object. But we do – we do think that the reasoning that the court applied was erroneous for a number of reasons, and we would urge the court to reach those reasons rather than just remand for an express finding. I think the best reading is that that is the basis on which the court enhanced damages, that plus the litigation misconduct that I've just addressed. Okay, thanks. One final question. This is Judge Proust, and this goes to the infringement. I think we're talking – I'm talking now about Claim 31 and the first measurement, claim construction. I mean, I guess your view and your position, it may make common sense or sense to a normal person, but you don't disagree, do you, that nothing in the express claim language or in the grammar of the claim affirmatively requires that the calculation is based on the first measurement, right? It's certainly expressed. We think that it is implicit from two aspects of the claim language and structure, but I agree that it doesn't specifically say that in the second step. What we're relying on is, first, the meaning of calculating, and then, second, the fact that the preamble was held to be limiting, and, indeed, the only reason this claim was not anticipated by the prior art was that the preamble is limiting. And so all of these steps need to be tied together by the preamble and do a computer-implemented method for blending a butane stream and a gasoline stream. So when the steps calculating a blend rate at which the butane stream can be blended with the gasoline stream, when you get to that step, immediately after taking the first measurement, indicating the vapor pressure of the gasoline stream, we think that the most natural reading of that language is that the calculation, which has to be based on a figure for it to be a computer-implemented method for blending, that the figure that it's based on is the measurement that the claim has just specified. Okay. Thank you. If my colleagues have nothing further, we will restore rebuttal time to you, Mr. J. I'm sure you're well into it and here for Mr. Kevel. Thank you. Thank you, Your Honor. Thank you, Your Honor. I'd like to start, Judge Stoll, you asked the question, I believe, of where the district court found willfulness. That's at Appendix 126. It says the court also finds that Venture willfully infringed the other asserted claims and awards Sunoco damages of $2 million, trebled to $6 million. So there was an express finding of willfulness. Thank you. And, Judge Probst, I'd like to start. Yes. I wanted you to start if you have any disagreement with the preliminary questions we asked of Mr. J. about how these moving parts fit together. No. I think he accurately represented how the moving parts fit together. Thank you. Judge Probst, one other housekeeping point. You asked about withholding critical information. That's a fact finding that has substantial evidentiary report, and one of the things that the district court relied on is at Appendix 10768, the technics proposal that they had, which essentially copied the Sunoco invention, which they did not give to Mannion, and would have corrected a number of the errors that Mannion had in his opinion. Is that cited in your brief, is that in your brief in red? Is there an argument, is that cited in red? I'd have to go back and check, and I will, but I do know from trial that was one of the things that the district court relied on for that portion of the judgment. And I think that's in our red brief. I'm looking as we talk at 16. Thank you. Could you just respond? I don't want to interrupt your chain of thought, but one point that we discussed with Mr. J was the need for a remand on the second prong of ready for patenting if we hypothetically agree with him on the argument on experimental use. Do you want to speak to that? Your position is, I assume, that we would need to remand and that there's fact finding necessary. Do you want to amplify that? No, I think you have that exactly right. I mean, I think it never needed to be reached and shouldn't be reached here because the contract is primarily experimental, and the inventors all testified. The district court looked at this multiple times, made considered fact findings, but the district court did not reach that second prong. And so if it was to need fact finding on that, it would have to be remanded. How do the sales of the butane figure into whether this is experimental or not, the contract? Well, because the contract was simply for them to see if this concept would actually work, and they needed two rounds of experimentation to get there. The butane doesn't kick in until you successfully pass two rounds of experimentation in either one of those rounds, whether it's the Wheatland testing to see if the equipment can communicate successfully or whether it's the separate testing at the Equalon site when they build it. If either of those fail, then MCE was required to take the equipment back at its cost. It got paid nothing, and there was no butane sale. So there never has been a butane sale? So after the successful passing of the two experimental phases, then the equipment was installed and put into use, and after that, there was a butane sale. And I will point out that that contract was different from every other contract. The Equalon contract, because they had no patent, because they didn't know if the equipment would work, they structured that with this where they essentially gave the invention for free in exchange for being able to do the testing and experimentation, and then they would sell butane. In all of the other contracts that come after that, once the patents were filed, there is no sale of butane. The butane is just a pass-through at cost. Equalon was the only one that was structured that way. This is Judge Schill. Could you explain to me, in the pre-installation Wheatland testing, what is the evidence for why the Grabner analyzer had to be tested? That is... You can just even summarize it for me. Well, the summary is this. The Grabner was a brand-new piece of equipment, and it was not ever used for this purpose. It wasn't intended for this purpose. And the testimony from Mattingly, some of it is at least Appendix 6358, where he said there were difficulties because they were using this in a way that it wasn't intended, and they didn't know if it would work to control and communicate with the system. Specifically, what about it was a way that it was not intended? The Grabner was a device that was not intended to be able to communicate with the controller and be able to use that to turn on and off and open valves and be part of that system. The Grabner was a device that was meant to output, here's what the pressure is, the read vapor pressure. Mr. Kettle, I'm a little confused because it seems like the discussion about Wheatland really goes more to what we were discussing a few minutes ago, which is whether the invention was ready for patenting and might be germane to that prong rather than to the prong we're discussing here. Am I completely off on that? Yes, you are off on that. With respect, what really the inventors had this idea, here's an equipment that can measure read vapor pressure online, but we have no idea whether it will work in a system or not. This was not just building the prototype. They had substantial questions and difficulty in trying to get it to work. Judge Still, did you finish that line of questioning? Yes. I would point, there's some additional testimony on that at 6443 in the appendix as well, if you were to look at that. They had to write all of the software from scratch because this was a new idea that they were working on and this was a new device that had never been used in this type of installation. Okay. There's another point just in the district court's opinion that I didn't understand. The district court found that MCE was under a confidentiality agreement based on Equilon's agreements incorporation of another agreement. Wasn't the district court wrong about that? No. The other case required confidentiality regarding products, which was a defined term relating to petroleum products, not equipment, right? The defined term products goes to the refined petroleum products, you're correct, but the confidentiality says during the time of the contract, the parties may disclose to each other time-to-time certain business, technical, and other information concerning products. So it wasn't limited to just information about the products. It was to business and technical information concerning those. And so the parties operated under that, and the testimony of the witnesses was that was the understanding as well, which would also underpin that fact. This is Judge Proust again, Mr. Kevel. Can you tell me why this case isn't at some level similar to Helsin, where Helsin, the predicate for Helsin was FDA approval, which would have required testing, and the court nonetheless concluded that this was not experimental. Why is, I mean, I know it's not on all fours, but why is this that much different in terms of the post-installation testing, which was just to verify that the system worked? In this case, this is not to verify the system worked. There is a lot of testing that had to take place, and the invention here isn't on sale. If the Wheatland test didn't work, if they couldn't make it work, the whole contract is canceled, and MCE absorbs all the expense. If the secondary testing at Equilon didn't work, the whole contract is canceled, and everything is done at MCE's expense. So it's very different from an FDA approval case. I mean, I guess the testing was provided in order to effectuate the sale, rather than the sale being carried out in order to occasion the testing. And isn't that kind of the point where we draw the line in terms of experimental use? But this case is more similar to Honeywell in that the inventors in this had no reason to know that this would work. They had an idea that they hoped would work. They needed a place to test it, and that was the basis of this contract. This contract was not to sell an invention that they knew would work. Why was it that I understand, please correct me if I'm wrong, but wasn't the Grabner testing done? It wasn't even at the site of the sale, right? It wasn't there. It was elsewhere. So why was that testing necessary to a contract for sale? I mean, why was it necessary? Like, why couldn't it be done before there was any kind of offer for sale? There's no reason, I guess, that it couldn't have been. It was just part of the experimentation, right? So they could have tested it at Equilon. They could have brought the software people there and had them write the software and test it there. But when you're talking about software and whether two pieces of equipment will communicate, there's no reason that had to be done at Equilon, and I don't think there's any requirement for an experimental contract that all of the experimentation happen at the site. I understand, but it's something to think about as we're thinking about, you know, is the primary purpose of this experimentation or is it a commercial sale? And so in thinking about it, it does seem to undermine your position a little bit that this part of your alleged experimentation could have occurred without any sale at all or it didn't require a particular testing site, right? Well, remember that the whole point of this is to try and come up with a system that actually works, right? And so, A, they need a terminal if they can get past the Wheatland testing in order to have the facilities with the gasoline that you can test this on a level. So the first phase, if the Wheatland test didn't work, the whole contract is canceled, nothing goes forward, and MCE absorbs all the expense. The U.S. Venture has tried to portray this as the reason they had the contract was so that they could fund some of these experiments, and that's exactly wrong. They didn't get paid anything, and they wouldn't get paid anything, unless they successfully passed both test phases, the Wheatland and the Equilon. So that, again, goes to show why it's experimental. They didn't enter this to fund the testing. I know I'm going past my main time, and I would like to address lost profits if I could, unless there are any other questions on these points. So in this case where you have evidence of undisputed, in some cases, evidence of infringement, you have U.S. Venture admitting they meet all the claims, you have a district court finding of willfulness supported by fact findings, and you have an established licensing program where you have 14 large customers, many of whom own the prior art in this case, entering these agreements to use Sunoco's patented invention and share the profits. If this case, which is essentially a two-player market case, because U.S. Venture was only aware of Texon and then used a third party to copy the Texon system, if there is a stronger case for lost profits than this one, it's hard to imagine. What happened here was the district court disagreed on the fourth Panduit factor on a fundamental misunderstanding of how the contracts work. And it's the same fundamental misunderstanding that the other side has, because they repeatedly refer to these are contracts for butane supply, and Sunoco shouldn't make the profit off the butane supply. But if you read the contract, it's very clear Sunoco provides butane and then charges the gasoline price for those number of gallons and then rebates its actual cost for the butane. So it makes no profit on the butane. It's simply using the invention, and it's essentially like a throughput license. The output of the invention, we split the profits that you make. And so there was a fundamental misunderstanding. And ultimately, the other side, U.S. Venture's expert, agreed that if the court found on factor two that there were no available non-infringing substitutes, then all the Panduit factors were met. And there's no dispute that Sunoco lost profits because it was a two-player market. So this case needs to be remanded for the district court to do a proper analysis on the lost profits. Counsel, in this case, the district court wasn't holding as a matter of law that you weren't entitled to the lost profits. Instead, it was a factual determination that reviewed for clear error. Is that correct? Well, the factual determinations would be reviewed for clear error, but the issue of whether there should be lost profit damages available is a legal question that's reviewed de novo. And in this case, where it's undisputed that lost – I apologize. I just want to make sure we're in agreement that she ruled as a fact finder and not – she didn't rule as a matter of law that you weren't entitled to lost profits, right? It's not like it was a Dalbert challenge or something like that. Instead, she was the fact finder in this case in making this determination, right? She is the fact finder, but what happened is there was no facts provided by the other side for her to find, and so she just passed over lost profits. Under the Georgetown case, we made our prima facie showing, and then the burden shifted to defendants to rebut. But we're entitled to lost profits, and the court ruled that there were zero lost profits, and that's clear error. Okay. Anything else from my colleagues? If not, we'll reserve some rebuttal if Mr. Jay deals with your cross-appeal issue. Anything further? Mr. Neville? No, Judge Frost. Thank you. I'm sorry. That's okay. Mr. Jay? Thank you, Your Honor. I will respond just briefly on the lost profits point to start. The basic factual point on which the district court made a finding was Venture's submission that the butane supply agreements, which were the sole measure that Sunoco provided as its computation of its lost profits, those butane supply agreements give Sunoco compensation for much more than just the use of its specific funding technology. So the court found that it would be inappropriate to conclude that U.S. Venture would have entered into one of those agreements with Sunoco, and that is what Sunoco's lost profits theory depended on. That factual finding- Mr. Jay, can you respond to the argument of your friend that Sunoco didn't make profit in the butane supply agreements? I think the best response to that, Your Honor, is to look at the other agreements in which it continues to get profit sharing even after the patents expire. So the idea that 100 percent of the compensation is for the use of its intellectual property, and not just its intellectual property writ large, but these specific patents, that's incorrect, because Sunoco's own arrangements show, and this is testified to at 6819 to 6820 of the appendix, that it's going to continue to get profit sharing from butane blending even after these patents expire. And I think that that underscores that what Sunoco is selling is an exclusive butane supply agreement, where it is providing access to its access to lower-cost butane, its transportation, its ability to hedge, all of those things it says confer value over and above the use of the intellectual property. It doesn't own a patent on the concept of blending butane with gasoline. It doesn't even own a concept on doing it with some level of automation. It only owns patents on these specific methods. And the district court correctly found that the full measure of profits that would be shared under a butane supply agreement wildly overstates the amount of compensation that Sunoco would have received, even as a lost profits measure, from the use of the patented technology. Just on rebuttal on the main appeal, could you respond just briefly to your friend's discussion of the Wheatland testing point? Absolutely. I believe my friend predicated his assertion that the Wheatland testing was not that commercializing based on a couple of things. One, that they weren't going to get paid for butane yet. And while that may be true, they had signed a commitment with Equilon to buy 500,000 barrels of butane. So in other words, they had locked up revenue in the future. They had locked up Equilon as a customer for butane supply. So they had certainly derived value. And then the second point was based on his reading of the contract, that if the testing fails at any point, including the testing at Equilon, that the whole contract is canceled. And that is just simply not correct. If you look at section 1.10 of the contract, 1.10a, this is at page 9056, is where the Wheatland testing comes in. The Wheatland testing allows MCE to say, okay, it hasn't satisfied our minimum operating standards, and so we're going to terminate the agreement. But once it passes that testing, which it did before they started installing, and that's testified to at 6450 of the appendix, then you move to the next page, subparagraph B. Upon completion of installation of the equipment, and it goes on to discuss the validation testing that will occur at Equilon, there is absolutely no right to terminate at that point. If it fails validation testing, then MCE needs to fix the equipment or find some way to deliver one, or it will be in breach. Equilon's obligation to buy butane is absolute under both of these. In other words, as long as the equipment passes to MCE satisfaction at Wheatland, Equilon is on the hook to buy butane. As long as the equipment is installed, MCE is on – sorry, Equilon is on the hook to buy butane. MCE does not have a right to rescind the agreement based on the validation testing that occurs at Equilon, and that is the testing that matters. The testing at Wheatland, I think our response to that is the Allen Engineering case, which says that it doesn't matter whether the invention was under development or subject to testing. The purpose of this – I'm sorry. No, you can finish your point, but I wanted to move on because time is short, and for you to respond to the colloquy I had with your friend about the confidentiality agreement and the district court's findings with respect to that. Okay, yeah, I think the court has my submission on Wheatland, so I'm happy to move to that. Our submission in our brief was that the district court had misread the confidentiality provisions. The other side did not respond to that in its brief. So my friend now says that this is actually – this comes in under a provision of the incorporated contract that refers to information relating to products, and that's a new argument that we're hearing for the first time. But I don't think that it's true as a factual matter because if you look back at the definition of products, even construing the confidentiality provision broadly, products are still refined intermediate petroleum products and refined petroleum products, and this just doesn't cover the equipment. I would like to give Judge Stoll the site that I promised to have on rebuttal. The figure itself is at page 8295 of the appendix. This is the figure referred to in Mannion's letter, and that's confirmed in the testimony, appendix 7380-81, and then page 8277 is where his report says that the proposed system is shown in detail in this process and instrumentation diagram. I'm sorry for not having that when I was getting the opening argument. Thank you for that. And ultimately, just to underscore on willfulness or enhanced damages, that this is a family-owned company. It did not have a sophisticated in-house IP function or any in-house IP function at all, and the company relied on Mannion to provide an opinion. When that opinion came back saying that with this modification, you know, blending to a tank instead of a rack, it does not infringe, that is what the company did, believing that it did not infringe. And the notion that this is copying or that the blending was expanded, you know, both fall under that aspect of the opinion. Okay. We thank you, and let's turn back to Mr. Kevil for a response on the cross-appeal. Thank you, Your Honor. Two points that I particularly want to raise. One is, counsel did not really respond to your point about where is the profit in the butane sale and said, well, there are many things in these agreements. But that's an issue they're raising here. Down below, what their expert Malachowski said was the only thing that he pointed to that was not patented and that Sunoco was making profit and since implied that that should be important was simply butane. And there is no profit from the butane in any of these contracts, and you can see it when you go through the contracts. So there isn't zero loss profits. There isn't any profit on the butane, which is the only thing Malachowski said below needed to be apportioned, and you can find that at Appendix 79-78-79 and at 8025-8026. They did not dispute that there were profits. He only said you shouldn't get the profits for the sale of butane because butane is not patented, and he was simply wrong. There is no profit from butane in these contracts. That's one point. The other point I'd like to reply to is the issue of the contracts going beyond the term of the patents. The issue in that is like a Kimball issue where the patentee is entitled to recoup the costs and structure the deal in a way that they can amortize the costs over time. Remember the testimony down below was these systems cost between $2 million and $5 million to install, and so it's reasonable to extend the life of the contract to cover those upfront installation costs, which is what happened here. I'm sorry, Your Honor? No, I was just going to ask my colleagues if they had any questions, but please go on if you have another point to make. The one point I would make on this is essentially what Venture tries to say on this appeal is that Sunoco should be faulted for not bidding against itself. Sunoco should have come in and said, despite the experts saying here are all these contracts I've gone through, I've found the ones that are most comparable to this, I've done the economic analysis, here's what the lost profits are, and there's no need to apportion because every part of this falls under the patents. It's either making or using the invention. They did not rebut that at all, and so in a case like this, essentially what they're saying is, but Sunoco should have said, well, if I do need to apportion out something, here's what I would apportion out, and if I do need to apportion something else, here's what I would apportion out. Instead, what Sunoco did was said, look, there is no need to apportion. Here are the lost profits. It was unrebutted, and it's a case where lost profits clearly should be awarded. U.S. Venture, you know, undisputably made 40 some odd million in profits, and under any of these agreements would have paid a substantial amount to Sunoco, but in essence by litigating and saying, well, these agreements are butane sales, which they're not, ultimately get away for $2 million. Okay. Anything further from my colleagues? Any further questions? No. Okay. Thank you. We thank both sides, and the case is submitted. Thank you, Your Honor. Thank you, Your Honor.